IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  WDQ-14-0042 |
| | * | |
| CRAIG ANDERSON | * | |
| a/k/a "Snaps" | * | |
| a/k/a "D" | * | |

**************

### GOVERNMENT'S CONSOLIDATED MOTIONS RESPONSE

The United States, by and through its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Paul E. Budlow and Zachary A. Myers, Assistant United States Attorneys, hereby responds to the pre-trial motions filed by the defendant in the above-captioned case.

### I.   FACTUAL AND PROCEDUREAL SUMMARY OF THE CASE

#### A.   Victim 1 Reports Anderson's Human Trafficking Activities

On the evening of October 3, 2013, a woman reported to the Howard County Police Department (HCPD) that she had been beaten by her pimp, and wanted to speak to the police about it. The woman, identified here as Victim 1, had a bruised right eye and scratches on the left side of her neck. HCPD Detective First Class Joshua Mouton, the Howard County Police Department's sworn Pimp Expert, responded to the Fire Department office near Sykesville to meet with Victim 1 and begin an investigation.

Det. Mouton interviewed Victim 1, who gave a detailed statement about her pimp and his human trafficking activities. Victim 1 identified her pimp as Craig Okeido Anderson, and stated that he also went by the name "Snaps." She also alleged that Anderson has numerous warrants for his arrest and told Det. Mouton that Anderson had been using the driver's license of another

1

person, Damian Manley, for approximately a year. Victim 1 stated that Anderson always wore nice clothing including "Jordan's shoes" and Nikes and that he had gold fronts on his teeth. She also described several of Anderson's tattoos including the names "Dominic" and "Alvin" on his neck, allegedly the names of his two sons, the words "the Boss" across the top of his hand, and the name "Jessica" tattooed over his heart.

Victim 1 stated that she had been with Anderson for approximately two years. Victim 1 had never engaged in commercial sex acts prior to her involvement with Anderson. Victim 1 initially believed they were in a romantic relationship, but eventually Anderson suggested that she engage in commercial sex acts so that they could make a lot of money. Anderson promised Victim 1 a house and a good life for Victim 1 and her children. Anderson was persistent with Victim 1; he talked to her frequently about his connections in the commercial sex industry, and how badly he wanted to succeed as a pimp. Victim 1 initially refused, but eventually gave in and began working as a prostitute for Anderson in approximately 2011.

Victim 1 stated that once she began prostituting, Anderson had her get a tattoo on her thigh of a horse with the words "Snaps Thoroughbred" written above it. She also stated that Anderson had taken her to Virginia, Delaware, and Maryland for purposes of prostitution.

When Victim 1 started prostituting herself for Anderson she was the only prostitute working for him. Victim 1 gave Anderson all of the money she was paid after every commercial sexual encounter. Three other women worked as prostitutes for Anderson while she was with him, two of whom were still working with Anderson. Victim 1 also stated that the two other women working with Anderson at the time, referenced here as Victim 2 and Victim 3 also had tattoos that reference "Snaps." Each of these women also gave Anderson all of the money they

were paid after every commercial sexual encounter. Anderson decided what the women would wear, and when they would be given money to spend.

Victim 1 was referred to as Anderson's "Bottom Bitch," a slang term for a pimp's top prostitute. Anderson directed Victim 1 to post prostitution ads online, advertising herself and the other prostitutes on backpage.com. Victim 1 purchased the advertisements using prepaid cards. Victim 1 stated that Anderson supplied his prostitutes with ecstasy and other drugs to keep awake and able to perform commercial sex. She stated that recently he'd given them enough drugs to keep them working for two straight weeks, including one day where Victim 1 and another prostitute serviced thirty commercial sex customers in a single day.

Anderson told Victim 1 that whenever any of his prostitutes stepped out of line, it was up to him to straighten them out with his mouth or his hands. Victim 1 stated that Anderson beat her in front of the other girls to scare them. Victim 1 stated that Anderson had recently punched her in the face multiple times and scratched her neck while in a car outside a Motel 6 in Howard County, Maryland leaving her with a black right eye and visible scratch marks on her neck. Det. Mouton took pictures of Victim 1's injuries.

Victim 1 stated that Anderson had two cars: a black Lincoln Towncar he had recently purchased, and a gold Cadillac. Victim 1 stated that Anderson had taken temporary license plates off of a car he had purchased and then returned, and put the temporary plates on the black Lincoln. Victim 1 stated that Anderson used to drive his prostitutes to various hotels in his gold Cadillac. A few days earlier, Anderson drove Victim 1 to Laurel, Maryland in the gold Cadillac. Victim 1 stated that the gold Cadillac had a vanity plate displaying the terms "choosing up" and "sucka ducka," and that the vehicle was still parked somewhere in Laurel, Maryland. Victim 1

also stated that Anderson had an AK assault rifle in the trunk of his gold Cadillac wrapped in a Washington Redskins blanket.

Victim 1 told Det. Mouton that the last time she had seen Anderson was three days prior when they had stayed at an Econo Lodge in Laurel, Howard County, Maryland, while Victim 1 worked as a prostitute out of the hotel. Victim 1 stated that the last communication she had with Anderson a text message from him sending the number for a Western Union pre-paid card. Victim 1 stated that Anderson had recently brought Victim 1, Victim 2 and Victim 3 to a Motel 6 in Linthicum, Anne Arundel County, Maryland. Victim 1 stated that Victim 2 and Victim 3 were currently staying with Anderson in rooms 235 and 237 of the hotel.

### B.  Officers Confirm Information Provided By Victim 1

After speaking with Victim 1, Det. Mouton confirmed that Anderson had multiple outstanding warrants and that was his driving privileges were suspended. According to Maryland court records, the following warrants for Anderson's arrest were active as of October 3, 2013:

| DATE WARRANT ISSUED | CHARGE(S) | COURT |
|---|---|---|
| March 20, 2013 | BURGLARY-FIRST DEGREE<br>MAL DEST PROP/VALU - $500<br>THEFT LESS THAN $100.00<br>TRESPASS: PRIVATE PROPERTY<br>BURGLARY- 4TH DEGREE-DWELL<br>MAL DEST PROP/VALU - $500 | Baltimore County District Court |
| March 21, 2013 | CDS: POSSESSION-MARIHUANA | Prince George's County District Court |
| August 1, 2013 | MAL DEST PROP/VALU - $500 | Baltimore County District Court |
| September 25, 2013 | PERSON DRIVING MOTOR VEHICLE ON HIGHWAY OR PUBLIC USE PROPERTY ON SUSPENDED LICENSE AND PRIVILEGE | Baltimore County District Court |

Anne Arundel County Detectives Adkins and Dickey traveled to the Motel 6 where Victim 1 stated Anderson was staying with Victim 2 and Victim 3. While at the Motel 6, Detectives Adkins and Dickey conducted surveillance around the Motel 6 for approximately two hours. Detectives Adkins and Dickey also located a black Lincoln Towncar matching the description given by Victim 1 and being driven by a man later determined to be Anderson.

Anne Arundel County patrol units stopped the Towncar in a Wendy's parking lot across the street from the Motel 6. Anderson gave officers a Virginia driver's license in the name of Marlon Damion Manley. Officers determined that the temporary tags affixed to the black Lincoln had been issued to a different vehicle.

Det. Mouton located the gold Cadillac in Laurel with a vanity plate on the back of the car displaying the words "choose up," with some letters missing across the top, and "sucka ducka" across the bottom. A photo of two young boys was displayed on the dashboard of the gold Cadillac. The vehicle was registered in the name of a woman identified here as Jane Doe 1, and the registration expired on July 3, 2013. Upon identifying the vehicle, Det. Mouton called for a tow truck to secure the vehicle.

### C. Anderson Is Arrested on Outstanding Warrants

After securing the gold Cadillac in Laurel, Det. Mouton traveled to the Wendy's in Linthicum where Detectives Adkins and Dickey had stopped Anderson. Anderson was wearing gold fronts on his teeth and Nike Jordan shoes. Anderson had a tattoo of the words "Da Boss" across the top of his hand and the names "Dominic" and "Alvin" tattooed on his neck. Anderson's key ring included a key to the black Lincoln an unidentified vehicle key. Anderson was driving with a female passenger when he was stopped, identified here as Victim 4. There

was an outstanding warrant from Montgomery County for Victim 4's arrest and she was taken into custody.

Anderson eventually admitted that his true name is Craig Anderson. Det. Mouton took Anderson to the Central Booking Facility in Jessup, Maryland, and charged him with human trafficking and prostitution. Officers found keys to motel rooms at a Days Inn, Econo Lodge, and another motel, on Anderson's person, along with a Western Union MoneyWise stored value card. Officers also found $100 in United States Currency, a Kyocera cell phone, and two large rings. Early in the morning of October 4, 2013, Det. Mouton served Anderson with copies of the warrants. Det. Mouton read Anderson his *Miranda* rights. Anderson waived his rights and voluntarily agreed to make a statement to Det. Mouton.

During his interview, Anderson stated that he sold the gold Cadillac to an unknown woman months earlier. When asked when he was last in the gold Cadillac, Anderson stuttered, seemed unsure, and stated he could not recall. Anderson eventually stated that he had been in the gold Cadillac the previous day. Anderson stated that he could not recall the last time he drove the vehicle.

During the interview, Anderson denied owning the black Lincoln, claiming that it belonged to a woman staying at the Motel 6 and that he was simply test driving the vehicle. Anderson also claimed that he did not purchase the black Lincoln, but that a woman purchased the vehicle. He claimed that the woman purchased the vehicle for $1,000.00 after initially purchasing a different vehicle and then returning it for the black Lincoln.

Anderson also asserted that he worked for a limo company and earns money by driving people around. Anderson stated that it must be Victim 1 who was being vindictive toward him.

He admitted to sending Victim 1 a text message containing information from a prepaid card and stated that he and Victim 1 were staying in room 237 of the Motel 6.

Initially, Anderson did not admit to knowing Victim 2 or that she was staying at the Motel 6. Anderson later admitted he knew a girl who went by Victim 2's nickname, "Panda" but did not know if she was staying at the Motel 6. He also claimed he did not know Victim 2 as "Panda," but that "Panda" would appear in his phone history frequently if searched.

Anderson also denied owning the gold Cadillac. He stated that had previously owned a gold Cadillac, but sold it months earlier to an unknown woman in Prince George's County for $1,000. Anderson initially claimed he did not know the last time he had been in the gold Cadillac because it had been a while since he owned it. When questioned further, Anderson admitted that he had been in the gold Cadillac several hours earlier, on October 3, 2013. Anderson also claimed he did not go by the name "Snaps" or any other nickname. He also initially claimed not to know what the term "bottom bitch" meant, but later admitted to knowing it was pimp slang.

### D. A Judge Issues a Warrant to Search the Gold Cadillac

On October 4, 2013, Det. Mouton prepared an application and supporting affidavit for a warrant to search the gold Cadillac. A copy of the affidavit is attached to this response as and a copy of the application and the warrant itself are attached as Exhibit 1. The affidavit set forth in detail Det. Mouton's training and experience, including years of investigations involving human trafficking, and being sworn as the office's Pimp Expert. Ex. 1.

The Honorable Sue-Ellen Hantman of the District Court of Maryland for Howard County issued the warrant on October 4, 2013. The warrant authorized the seizure of property related to prostitution and human trafficking. *See* Ex. 2. These items included, but were not limited to

records, receipts, hotel keys, addresses, telephone numbers, lingerie, cameras and photographs, firearms, cellular phone, computers, and sex toys. *Id.*

Det. Mouton found that the unidentified key fob obtained from Anderson's key ring successfully unlocked and started the gold Cadillac. During his execution of the search warrant, Det. Mouton located an SKS assault rifle[1] with a flash suppressor zip-tied to the roof of the trunk and concealed underneath the liner of the trunk. A loaded extended rifle magazine was located on the right side of the trunk underneath the liner of the trunk wrapped in a tank top. A Washington Redskins blanket was folded up on the left side of the trunk.

Also found in the trunk were various women's shoes and boots. In the main cabin of the car, Det. Mouton found two framed pictures of young boys located in the backseat and the dashboard. He also found a bubble-lined mailing envelope in the front floor board addressed to Craig Anderson and a belt buckle appearing to be covered in diamonds with a picture of a fist clutching a handgun located in the rear floorboard. Scattered throughout the car were five prepaid cards including Vanilla Visa, Western Union Visa, Boost Mobile, Verizon prepaid, and Vanilla reload.

Det. Mouton also found several items related to the investigation in the center console of the car including a business card with "Call me, Sir Chill, Money Man 240-565-5450" written on the back. Two cell phones were located in the center console- a NokiaX2-00 and a Motorola V325. A receipt for the Garden Inn dated August 24, 2013, in the name of Damion Manley was found in the glove compartment. There were 29 different phone numbers written on the back of the receipt.

---

[1] An SKS rifle is a semi-automatic rifle similar to the AK series of rifles.

### E.  Anderson is Prosecuted in Federal Court

On January 28, 2014, a federal grand jury indicted Anderson on a single count of being a felon in possession of a firearm, specifically the semi-automatic rifle seized from the gold Cadillac. (Dkt. #1). Anderson has filed motions to suppress: (1) any statements Anderson made to police while in custody (Dkt. #20), (2) any items taken from Anderson at the time of his arrest (Dkt. #21), and (3) any evidence seized pursuant to the warrant authorizing the search of the gold Cadillac (Dkt. #22). Anderson has also alleged that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## II.  ARGUMENT

### A.  Anderson's Motion to Suppress His *Mirandized* Voluntary Post-Arrest Statement Lacks Merit

Anderson has also moved to suppress any statements, admissions or confessions which the government proposes to use as evidence at trial. All statements made by the defendant, however, were voluntarily made after he was advised of his rights and are therefore admissible.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person...shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amendment V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436 (1966); *Dickerson v. United States*, 530 U.S. 428 (2000). Specifically, in *Miranda*, the Supreme Court held that before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect, in substance, that he has the right to remain silent, that his statements may be used against him at trial and that he has the right to an attorney during questioning. *Id.*

After a court determines whether *Miranda* applies to a case, or whether the case instead falls within an exception to *Miranda*, that court, in order to find that a statement is admissible at trial, must next find that the statement was voluntary and was not "coerced" from the defendant.

The government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. *Miranda*, 384 U.S. at 475. The applicable test for evaluating the voluntariness of a statement or confession is whether, given the totality of the circumstances, the will of the person making the statement was "overborne and his capacity for self-determination critically impaired." *United States v. Gray*, 137 F.3d 765, 771 (4th Cir. 1998)(citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)); see also *Mincey v. Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).

Statements obtained from a defendant during custodial interrogation are not compelled, in violation of the Fifth Amendment, if the government shows "that law enforcement officers (1) adequately informed the defendant of his *Miranda* rights and (2) obtained a waiver of those rights." *United States v. Graves*, 545 F. Appx. 230, 236 (4th Cir. 2013) (internal citation omitted). "To effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words. A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then subsequently is willing to answer questions." *United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014).

In assessing the validity of the waiver, courts look at the totality of the circumstances relative to the defendant, including the suspect's intelligence, education, age, familiarity with the criminal justice system, physical and mental condition. *See e.g. Stawicki v. Israel*, 778 F.2d 380, 382-84 (7th Cir. 1985)(valid waiver by defendant with high school equivalent education and

average intelligence and despite absence of express waiver as defendant had five prior arrests); *Correll v. Thompson*, 63 F.3d 1279, 1288-89 (4th Cir. 1995)(valid waiver by defendant with I.Q. of 68 because defendant was 24 years old and had many experiences with both law enforcement and *Miranda* warnings); *Campaneiria v. Reid*, 891 F.2d 1014, 1020 (2nd Cir. 1989)(valid waiver despite recent surgery, pain, dizziness and recent ingestion of pain medication because medical records showed defendant awake and alert); *United States v. Guay*, 108 F.3d 545, 550 (4th Cir. 1997)(valid waiver despite suspect's broken shoulder and other car accident related injuries because officer confirmed with hospital that suspect was not under the influence of judgment impairing medications).

In assessing the validity of the waiver, the courts also looked at the totality of the circumstances surrounding the taking of the statement. In making this determination, "coercive police activity is a necessary predicate" to any finding that a confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Moreover, the Fourth Circuit has unequivocally found that the "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997).

In applying these general principles to various factual scenarios, the Fourth Circuit has expressly considered several factors in determining whether a statement was made voluntarily. Specifically, the Fourth Circuit has considered, among other things, factors such as: (1) whether law enforcement officers properly advised the defendant of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the defendant that he was legally obligated to speak with them; (3) whether the officers physically or

verbally threatened the defendant; (4) whether the defendant appeared to be cooperative; (5) whether the defendant was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning of the defendant. *See generally, Braxton*, 112 F.3d at 781-85; Gray, 137 F.3d at 771.

Moreover, in *Braxton*, the Fourth Circuit fully articulated the parameters of what law enforcement officers *can* properly say to a suspect during questioning. *Id.* at 780. Among other things, the Fourth Circuit held that it is entirely proper for officers: (1) to tell a suspect that they need to speak with him; (2) to tell a suspect that they believe that he is not telling the truth; (3) to advise a defendant that if he is not being truthful, he could face a term of incarceration; and (4) to truthfully advise the defendant about the types of charges that could be or have been filed and the amount of prison time he may face for those crimes. Id. at 781-84 (finding that a statement made by agents that they "needed" to speak to the defendant and their warning that he would "face five years" if he did not "come clean" were not sufficiently coercive to render the subsequent statement involuntary).

The Court must evaluate the totality of circumstances with regard to the defendant and his statement, in order to determine whether it was given knowingly, voluntarily and intelligently.

Applying these principles to this case, and based on the testimony that will be presented at the evidentiary hearing, the government will show that the custodial statements made by the defendant to investigators are admissible. On October 4, 2013, after the defendant was arrested and charged with human trafficking and prostitution the defendant made incriminating statements to investigators. Prior to making the statements, the defendant was verbally advised of his Miranda rights. The defendant advised that he understood his rights and further indicated this

understanding and that he was willing to speak to investigators. He did not ever invoke his right to counsel or to terminate the interview. Anderson was never told that he was obligated to speak with the officers, there were no verbal or physical threats to the defendant, the defendant was cooperative throughout interrogation, and the officers did not engage in any violent behavior during the questioning of the defendant.

Additionally, Anderson was very familiar with the criminal justice system, having been arrested and charged on dozens of prior occasions. *See Rook v. Rice*, 783 F.2d 401, 404-05 (4th Cir. 1986) (An accused's personal characteristics, physical condition, and experience, or inexperience, with the criminal justice system may also be considered.). Based on these facts, defendant's statements were made voluntarily within the meaning of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution and are therefore admissible. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (admissibility of a defendant's statement turns on whether it was made voluntarily, as required by the Fifth Amendment). Accordingly, the government respectfully requests that this Court, based on all of the evidence that will be presented at the evidentiary hearing, deny the defendant's motion to suppress his statement.

### B. <u>Anderson's Motion to Suppress Evidence Obtained During His Arrest Lacks Merit</u>

Anderson has moved to suppress evidence obtained from him incident to his arrest on the basis that his arrest was somehow illegal and in violation of the Fourth Amendment. The fact that there is an outstanding warrant for the defendant's arrest alone creates probable cause for a defendant's arrest. *See United States v. Lee*, 225 F. Appx. 132, 134 (4th Cir. 2007). Once the officers have probable cause to arrest the defendant, a search incident to that arrest is proper, even if the search precedes the formal arrest. *Id.*

A search incident to a lawful arrest may extend only to "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *United States v. Baker*, 719 F.3d 313, 316-17 (4th Cir. 2013). The exception for searches incident to an arrest authorizes vehicle searches only in two specific circumstances: (1) when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search; and, (2) when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle. *Id.* at 317 (internal citations and quotation marks omitted). The "automobile exception," which permits a warrantless search of a vehicle when there is probable cause to believe the vehicle contains contraband or other evidence of criminal activity. *Id.*

At the time of his arrest Anderson had four warrants for his arrest outstanding. This alone established probable cause for his arrest. *Lee*, 225 F. Appx. at 134. Anderson was driving the black Lincoln when officers encountered him, despite the fact that Anderson's driver's license was suspended. After being stopped, Anderson provided officers false identification in the name of another person. The officers had more than sufficient probable cause to arrest Anderson. Thus, the search of his person and the area within his immediate control was justified without a further warrant. Anderson's motion to suppress evidence obtained incident to a lawful arrest should be denied.

### C.   The Defendant's Motion to Suppress the Results of the Search of the Gold Cadillac Should be Denied

#### 1.   The Warrant to Search the Gold Cadillac Was Supported by Probable Cause

The Defendant has moved to suppress the search of the gold Cadillac for the reasons that these searches were conducted without a valid warrant, without probable cause, without reasonable articulable suspicion that the defendant had committed a crime, and otherwise in

violation of the Fourth and Fourteenth amendments to the United States Constitution. Moreover, the defendant has demanded a Franks hearing alleging that Det. Mouton "failed to include numerous pieces of exculpatory evidence learned during the course of his cursory investigation, including the significant omission of critical aspects of Anderson's statement to police. The affiant also fails to include information diminishing the credibility of the source of the information, the alleged victim of the assault."[2]

> In reviewing a search warrant application, a magistrate judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). A court reviewing a magistrate judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), *cert. denied*, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Gates, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A commonsense reading of the affidavit supporting the warrant demonstrates that the warrant was supported by probable cause. In this case, the affidavit gave the magistrate a detailed description of Det. Mouton's training and experience, including that he was the HCPD's sworn Pimp Expert. In the affidavit, Det. Mouton provided detailed descriptions of Anderson, his prostitution operation, his tattoos, his vehicles and his firearm. As described in the affidavit,

---

[2] Although Anderson alleges numerous exculpatory and other omissions from the affidavit, his motion fails to identify the alleged omissions.

officers corroborated Victim 1's information about Anderson's whereabouts, the approximate location of Anderson's Cadillac, the fact that Anderson's Lincoln was improperly plated, and information about Anderson's outstanding warrants. Officers also located Anderson's other prostitutes in or near the room Victim 1 said they would be in. Furthermore, the search of the black Lincoln incident to Anderson's arrest yielded further evidence of Anderson's human trafficking and prostitution activities, including prepaid cards, motel receipts and keys, cash and various stored value cards. Given all of this evidence set forth in the affidavit, there was probable cause to believe that evidence related to human trafficking and prostitution would be located in the gold Cadillac.

2.  <u>Officers Executed the Warrant to Search the Gold Cadillac in Good Faith</u>

Even if a court finds that an affidavit failed to establish probable cause, the defendant is not entitled to have the evidence from the search suppressed. The Supreme Court has held that when officers seize evidence in reliance on a facially valid warrant issued by a magistrate or judge, and the affidavit is later found to lack probable cause, the evidence is not subject to the exclusionary rule of the Fourth Amendment and is admissible in the government's case-in-chief. *United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression). *See also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986).

> Pursuant to the good-faith exception, when an officer acts with objective good faith within the scope of a search warrant issued by a magistrate, suppression of the evidence obtained in the search does not serve the exclusionary rule's deterrence objective, as the officer has attempted to comport with the law. Therefore, evidence obtained pursuant to a search warrant issued by a neutral

magistrate does not need to be excluded if the officer's reliance on the warrant was objectively reasonable. Usually, a warrant issued by a magistrate suffices to establish that a law enforcement officer has acted in good faith in conducting the search.

However, an officer's reliance on a warrant is not objectively reasonable:

> (1) if the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;
>
> (2) if the magistrate wholly abandoned his judicial role as a detached and neutral decision maker;
>
> (3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
>
> (4) if the warrant is so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Gumula*, 554 F. Appx 222, 224 (4th Cir. 2014) (internal citations and quotation marks omitted).

In this case, Anderson ignores the affiant's clearly stated training and experience and the evidence in the affidavit corroborating the statement provided by the victim of Anderson's violent assault. Anderson also baselessly, and incorrectly asserts that the government has no interest in investigating Anderson's violent sex trafficking of the women he cajoled and deceived into engaging in prostitution for his sole financial benefit, while he kept them plied with illegal narcotics to keep them "working" for him. In fact, Anderson was charged with human trafficking and prostitution offenses in state court prior to the application for the search warrant. Anderson does not establish, or even allege, any grounds on which the supposed deficiencies of the warrant render the officer's reliance on the warrant objectively unreasonable. Because officers acted in

good faith in securing and executing the warrant to search the gold Cadillac, Anderson's motion to suppress the evidence obtained from execution of the warrant should be denied.

3.   The Defendant's Demand for a Franks Hearing Should be Denied

The defendant is not entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* permits a defendant to attack a facially valid warrant only "in certain narrowly defined" circumstances. *See United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). Anderson alleges the affiant "failed to include numerous pieces of exculpatory evidence learned during the course of his cursory investigation including the significant omission of critical aspects of Anderson's statement to police . . .[and] information diminishing the credibility of the source of the information."

> *Franks* clearly requires defendants to allege more than intentional omission in this weak sense. The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit. *Franks* protects against omissions that are *designed to mislead,* or that are made in *reckless disregard of whether they would mislead,* the magistrate. To obtain a *Franks* hearing the defendant must show that the omission is the product of a deliberate falsehood or of reckless disregard for the truth. Mere negligence in recording the facts relevant to a probable-cause determination is not enough.
>
> This case presents a question of omission rather than commission on the part of the agent. While omissions may not be *per se* immune from inquiry, the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory. This latter situation potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of *Franks* hearings to contest facially sufficient warrants is readily apparent.

*Colkley*, 899 F.2d at 301 (internal citations and quotation marks omitted) (emphasis in original).

The defendant seeking to make a showing that a Franks hearing is required carries a "heavy"

burden. *See United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994). Here, Anderson has failed

to specify the alleged "exculpatory information" contained in Anderson's self-serving and

uncorroborated post-arrest statement whose omission rendered the warrant invalid. Anderson

also attacks Victim 1 as the unreliable victim of an "alleged assault," while ignoring the evidence

set forth in the affidavit that officers obtained corroborating Victim 1's statements, including her

documented injuries, the location of Anderson and his other prostitutes, the text messages

between Anderson and Victim 1, and her detailed knowledge of Anderson's tattoos, clothing,

financial instruments, vehicles, and the semiautomatic firearm she knew was located in his trunk.

WHEREFORE, for the reasons stated herein, the government respectfully requests that

the defense motions be denied.[3]

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____ /s/_____
    Paul E. Budlow
    Zachary A. Myers
    Assistant United States Attorney
    36 South Charles Street
    Fourth Floor
    Baltimore, Maryland 21201
    (410) 209-4800

[3] In his motion to suppress the evidence seized pursuant to the warrant to search the gold Cadillac, Anderson also appears to raise suppression issues with regards to motel rooms he did not rent (which were used by his prostitutes to engage in commercial sex for his financial benefit) and cell phones, only one of which was his, which were searched pursuant to a valid warrant. (Dkt. #22 at ¶7) Should the defendant choose to file supplemental motions seeking suppression of this or other evidence, the government intends to seek leave to file additional briefing in response.

6

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 20th day of June 2014, a copy of the foregoing

*Government's Consolidated Motions Response* was electronically filed and made available

to Brendan A Hurson, Office of the Federal Public Defender, 100 S Charles, St, Tower II,

Ninth Fl, Baltimore, MD 21201.

Respectfully Submitted,

Rod J. Rosenstein
United States Attorney

_____/s/_____
Paul E. Budlow
Zachary A. Myers
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4800
*Filed via CM/ECF*